UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

RECOVERED ENERGY TECHNOLOGIES
INC., a foreign corporation, and RECOVERED
ENERGY TECHNOLOGIES USA INC., a
Wyoming corporation,

          Plaintiffs,

                                   Case No.

HV SOLAR LIGHTING, LLC, a Delaware
limited liability company, ROBERT J. BROTT,    JURY TRIAL DEMANDED
an individual, JOSHUA ABRAMSON, an
individual, and THOMAS BRADLEY
CARLSON, an individual,

          Defendants.

_____/

## VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs, Recovered Energy Technologies Inc. ("RET") and Recovered Energy Technologies USA Inc, ("RET USA" and collectively "Plaintiffs") sue Defendants, HV Solar Lighting, LLC ("HVS"), Robert J. Brott ("Brott"), Joshua Abramson ("Abramson") and Thomas Bradley Carlson ("Carlson" and collectively the "Defendants") and allege:

## **INTRODUCTION**

1.      This case is about trust betrayed and promises broken. Plaintiffs built a groundbreaking program to revolutionize how communities deploy sustainable streetlighting. Plaintiffs invested years of innovation, significant dollars, and countless hours to build a program that offered reliable, off-grid solar lighting through a subscription-based payment model.

2.      Plaintiffs shared this vision with individuals they believed were allies—people they trusted to help bring the program to life. Instead, those individuals turned that trust into a weapon. Acting in concert and pursuant to a common scheme, Defendants fabricated assignment documents, misled investors and clients, and interfered with Plaintiffs' contracts and business relationships. They withheld revenue, sabotaged Plaintiffs' operations, and spread false claims of ownership to seize control of the SLaaS program (defined below) and its lucrative contracts.

3.      Defendants' actions were not mistakes or misunderstandings. They were deliberate, calculated, and malicious. Their scheme destroyed Plaintiffs' reputation, caused the cancellation of multimillion-dollar agreements, and jeopardized the future of a program designed to advance renewable energy. Plaintiffs bring this action to hold Defendants accountable for their unlawful conduct.

## **PARTIES**

4.      RET is a Canadian corporation with its principal place of business in Kemptville, Ontario, Canada. For jurisdictional purposes, RET is a citizen of Canada.

5.       RET USA is a Wyoming corporation with its principal place of business in Kemptville, Ontario, Canada. For jurisdictional purposes, RET USA is a citizen of the Wyoming and Canada.

6.      Plaintiffs provide autonomous off-grid solar lighting primarily for streets and roadways as well as to entities including but not limited to developers and Community Development Districts ("CDD").

7.      HVS is a Delaware limited liability company formed in 2019. Upon information and belief, HVS has had two members since it was formed: Brott, a citizen of North Carolina, and Abramson, a citizen of New York. For jurisdictional purposes, HVS is a citizen of Delaware, North Carolina, and New York.

8.      HVS brokers funding for renewable energy projects, including solar powered streetlights.

9.      Brott is an individual domiciled in North Carolina and is therefore a citizen of North Carolina for jurisdictional purposes.

10.     Abramson is an individual domiciled in New York and is therefore a citizen of New York for jurisdictional purposes.

3

11.     Abramson and Brott are the principals of HVS.

12.     Carlson is an individual domiciled in Sarasota, Florida and is therefore a citizen of Florida for jurisdictional purposes.

13.     Carlson is a current shareholder of RET and a former shareholder of RET USA.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) over the subject matter of this lawsuit because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because there is complete diversity of citizenship between Plaintiffs and Defendants.

15.     Venue is proper in this district under 28 U.S.C. § 1391(b)(3) because there is no district in which an action may otherwise be brought under 28 U.S.C. § 1391(b) and Carlson resides in this district.

## FACTUAL ALLEGATIONS

### A. Formation and Early Operations of RET.

16.     In or about October 2016, Joel Brayman ("Brayman") and Carlson formed RET to pursue renewable energy projects, including waste-to-energy initiatives and the distribution of solar streetlights.

4

17.    Since RET's formation, Brayman and Carlson each owned fifty percent (50%) equity in RET and served as directors. All decisions regarding company business were made jointly and with both of their consent.

18.    Brayman introduced Carlson to Sunna Design, a leading French designer, developer, and manufacturer of intelligent, sustainable and connected solar streetlights. Following that introduction in or about August 2018, RET became the North American distributor for Sunna Design.

19.    Between 2018 and 2019, RET completed several solar streetlight projects using Sunna Design technology and a traditional sales distribution model. Sunna Design manufactured the solar streetlights and RET sold and installed them.

20.    In 2018, RET separately developed a leasing model that allowed developers to pay a monthly subscription fee for solar streetlights instead of an up-front payment or purchase. RET marketed and sold this as its proprietary Solar Lighting as a Service℠ program ("SLaaS").

21.    Under the new SLaaS distribution structure, RET executed contracts with major developers to install the Sunna Design streetlights. This included Kolter Land Partners LLC, n/k/a Brookfield Kolter Land Partners LLC ("Brookfield Kolter").

22.     To source and install the solar streetlights under the SLaaS model, RET required up-front capital to manufacture and/or source inventory necessary for its contracts.

**B. RET's Relationship with HVS.**

23.     It was recommended to RET that it seek a niche funder capable of starting small and scaling alongside the growth of the SLaaS program.

24.     In early 2019, Carlson introduced Brayman to his acquaintances, Abramson and Brott, as potential funding partners for RET's SLaaS model. Abramson and Brott then introduced RET to Hutton Capital Management ("Hutton"), an asset-based lender in alternative financing based in New York City. Hutton agreed to fund the first two (2) Brookfield Kolter projects.

25.     In April 2019, RET, HVS and Hutton created a working model between them. RET would operate as the supplier of streetlights, Abramson and Brott as funding brokers, and Hutton as funders.

26.     To broker financing, Abramson and Brott formed HVS on or about May 22, 2019.

27.     In particular, and for specified projects, RET would pursue solar streetlight projects, obtain executed Lighting Services Agreements ("LSA" or "LSAs"), and provide maintenance and support for the streetlights during the term of each LSA. Hutton, for its part, would transfer the capital required for RET to

source and install the streetlights. In return, Hutton would be allowed to claim certain tax benefits including Investment Tax Credits ("ITC") and Modified Accelerated Cost Recovery System ("MACRS") tax benefits. In addition, Hutton would receive interest payment(s) for the term of each LSA. HVS, for its part, would be compensated by receiving a broker's fee for arranging the funding and by sharing in the net profit from each LSA with RET. All of this was memorialized in a financial modeling spreadsheet shared with HVS and Hutton.

28.     In May 2019, RET closed projects with Brookfield Kolter called Avalon Groves and The Palms of Serenoa. To utilize the ITC and MACRS tax benefits associated with solar projects, HVS requested that RET assign the LSAs for these projects to HVS.

29.     RET executed an assignment for Avalon Groves that was not countersigned by HVS. Neither party executed an assignment for The Palms of Serenoa. Nor, to RET's knowledge, did HVS claim the tax benefits for either of these projects.

30.     HVS described Avalon Groves and The Palms of Serenoa as "learning projects" and stated that the tax benefits would not be included in overall project calculations but would help inform future initiatives.

31.     With the growth of the SLaaS program, and to manage U.S.-based projects, in March 2020, Brayman and Carlson incorporated RET USA in Wyoming

to ensure that all funds collected for U.S. projects remained in the United States. On January 26, 2021, the SLaaS program was serviced marked by RET USA.

32.    Prior to RET USA establishing U.S. bank accounts, Solar Carports, LLC, a Wyoming registered company wholly owned by Carlson ("Solar Carports") was used to conduct banking.

33.    While RET USA was the appropriate company to manufacture streetlights and conduct direct sales in the U.S., a new company, owned by RET USA, was established to lease streetlights in the U.S. through the SLaaS program funded by HVS investors.

34.    Consequently, in May 2020, Brayman and Carlson registered Solar Light as a Service Inc. ("SLaaS, Inc.") to serve as this entity. SLaas, Inc. was meant to administer investment capital as well as collect and distribute monthly payments earned from the SLaaS program. However, SLaaS, Inc. never collected client payments as intended and was instead used solely to administer investor funds to source, and later manufacture, streetlights.

35.    To increase returns, in or about June 2022, HVS replaced Hutton's institutional funding with investments from high-net-worth individuals introduced by Marcum LLP, n/k/a CBIZ ("Marcum"). Switching to Marcum leveraged HVS's relationship with one of Marcum's account executives who could market the

8

companies' tax benefits and interest return over a twenty (20) year term. The core business structure, however, remained unchanged.

36.     From 2019 through 2025, HVS transferred over $11 million to, *inter alia*, Plaintiffs consistent with the spreadsheet model presented to HVS and Hutton in 2019.

### C. Transition from Sunna Design to Plaintiffs' Proprietary ONall365 Lights.

37.     In 2021, Plaintiffs began to experience an unusual number of technical issues with Sunna Design lights. This prompted Plaintiffs to begin investing in the design, manufacture, and use of its own lights—a process that lasted about 18 months and culminated in Plaintiffs manufacturing its own lights branded "ONall365."

38.     During this transitory period, Plaintiffs focused their efforts on managing technical failures in already-delivered Sunna Design lights until the design of Plaintiffs' own ONall365 lights was complete. As agreed, HVS assumed the role of primary liaison with Sunna Design to discuss and resolve the technical failures plaguing the companies' prior deliveries.

39.     By the end of 2023, Sunna Design streetlights installed under the SLaaS program were failing at a catastrophic rate, including but not limited to, the solar panels, internal batteries, and the Sunna Core (smart controller). From the initial

Sunna Design installations until October 2025, Plaintiffs were forced to provide support and maintenance using their own resources.

### D. A Period of Significant Growth and Potential.

40.    While developing and manufacturing the ONall365 lights, RET USA continued to work with Brookfield Kolter to negotiate delivery of a significant number of RET USA streetlights for multiple new projects.

41.    In mid-2023, Brookfield Kolter awarded RET USA several major projects, sourcing all off-grid streetlights exclusively from RET USA.

42.    Although Avalon Groves and The Palms of Serenoa had been utilized as "learning projects" in prior years, the market opportunity crystallized after Brookfield Kolter awarded RET USA new projects. Thereafter, the parties discussed assigning the LSAs to HVS because HVS had advised this was required to enable HVS to claim ITC and MACRS tax benefits necessary to entice new investor financing.

43.    In or about September 2023, Brott, acting on behalf of HVS, sent Brayman an email with an unexecuted template to initiate the process of assigning the LSAs related to Plaintiffs' lights with Brookfield Kolter and other projects. The assignments were *not* executed at that time.

44.    Instead, Plaintiffs and HVS exchanged multiple communications to document their actions and the necessity of entering into a written agreement first.

All Defendants were aware of Brayman's refusal to assign LSAs without a written agreement memorializing the parties' roles and responsibilities, including the profit splits used in the parties' course of dealing already.

**E. Financial Model and Business Relationship Structure**

45.    While Plaintiffs and HVS agreed on a structure and financial model early in their business relationship, this model was jointly refined in two financial spreadsheets: the "Program Summary Spreadsheet" and the "SLaaS 20-Year Income Model."

46.    The "Program Summary Spreadsheet" furnished all parties with real-time access to comprehensive information concerning all facets of the SLaaS program. While the presentation of it evolved to provide a more accurate depiction of the program's progress, the underlying structure remained constant.

47.    The "SLaaS 20-Year Income Model" reflected program returns, how all parties shared in the revenue and costs associated with support and maintenance, funder returns, and technology replacement, amongst other things. The model allowed all parties to simulate projected income as new projects were introduced and accurately represented the nature and structure of the funding arrangement then in effect between them.

48.    While the financial models had been actively used as the basis for the parties' funding relationship and focus of their discussions for several years, RET

11

USA pushed to have the details contained in these models translated into a corresponding written agreement.

49.    In an email dated May 10, 2024, Abramson, acting on behalf of HVS, distributed the below flowchart confirming the parties' existing course of dealing, namely, that RET USA was responsible for operations, installations, and maintenance, and that SLaaS, Inc. was the entity designated to distribute funds and allocate shared profits.



50.    More specifically, the flowchart detailed the arrangement as follows: (a) RET USA would pursue solar streetlight projects, including sales, sourcing, assembly, and installation of streetlights and related equipment; (b) RET USA would provide all operation and maintenance for installation and service on the streetlights and related equipment; (c) RET USA would share in the profit from operation and

maintenance of the streetlights and equipment through the Marcum investors; (d) RET would share in the overall profits generated from SLaaS program; and (e) SLaaS, Inc. would collect and distribute the funds to RET USA, HVS, and the Marcum investors.

51.    Despite continued efforts to enter a written agreement, the parties' actions, communications, and course of dealing and course of performance over multiple years reflected a clear mutual understanding and agreement as to compensation, scope, and obligations.

**F. Day-to-Day Funding Operations.**

52.    The parties collaborated closely in all aspects of funding day-to-day operations. HVS was granted full access to all RET USA and SLaaS, Inc. bank accounts, received regular briefings from RET USA's bookkeeper regarding manufacturing accounts payable and outstanding invoices, and at times communicated directly with RET USA's suppliers. Beginning in early 2024, RET provided HVS a written financial report on a weekly basis.

53.    In the ordinary course of business, Plaintiffs submitted funding requests as needed to maintain operating cash flow, while HVS would either transfer a tranche of funds or directly pay certain expenses on behalf of Plaintiffs and the SLaaS program.

54.    The parties tracked a "balance of funding," calculated by comparing the number of streetlight systems installed against the total funds transferred to date. This balance was continuously updated in the "Program Summary Spreadsheet" accessible to all parties. The funding balance was reviewed and referenced regularly during operations.

55.    In the early stages of the relationship, the funding balance was negative—meaning Plaintiffs were temporarily "overfunded." This was expected, as Plaintiffs were manufacturing and installing an increasing number of streetlight poles, which were required to be produced in advance of scheduled installations.

56.    Throughout the relationship, Plaintiffs requested funds solely for the manufacture and installation of streetlight poles that had been contracted through a valid LSA.

57.    Over time, as additional streetlight poles were installed, the funding balance shifted from Plaintiffs being "overfunded" to "underfunded" by approximately $646,000.00 relative to the total funds transferred. The funding balance and its calculation were detailed in the SLaaS 20-Year Income Model spreadsheet.

58.    In late 2024, after Plaintiffs became underfunded, HVS began refusing to acknowledge Plaintiffs' legitimate support and maintenance expenses. These included costs incurred to repair and replace defective Sunna Design streetlights,

Plaintiffs' agreed-upon share of revenue and profits from SLaaS revenues, and other operational obligations—all of which had been detailed in the Program Summary Spreadsheet for years.

59.    Furthermore, HVS attempted to shift full responsibility to RET for payments not made by CDDs and other clients that defaulted following hurricane-related damage, despite HVS's prior acknowledgment that, under the LSAs such defaults were solely the responsibility of the CDDs or other clients.[1]

60.    Despite repeated efforts by Plaintiffs to enter a written agreement, which, among other things, addressed the funding balance, HVS deliberately disengaged from any substantive discussions. In effect, HVS acted as though amounts owed to Plaintiffs did not exist, while irrationally asserting that Plaintiffs owed funds to HVS.

## G. Breakdown in Financial Oversight and Carlson's Mismanagement.

61.    Beginning in 2017, Carlson managed installations and internal accounting for RET, while Brayman handled business development, contract management, supplier and partner relations, and funding negotiations.

62.    As part of Brayman's responsibilities at RET, and subsequently RET USA, Brayman was the signatory for supplier contracts and LSAs with clients. HVS was aware of this division of responsibilities at RET between Carlson and Brayman.

---

[1] The damage from Hurricane Milton is discussed more fully below in Section I.

63.    Given the growth of Plaintiffs' solar light business from 2017 to 2021, and to better control installation costs, in or around July 2021 and after, Brayman repeatedly urged Carlson to reconcile Plaintiffs' accounts to ensure accurate cost tracking.

64.    To further resolve administrative issues, Plaintiffs also agreed in or around 2021 to have the HVS Controller directly bill clients and provided HVS access to RET USA bank accounts to ensure transparency for the costs involved in manufacturing, installing, and maintaining streetlights.

65.    Importantly, HVS was thus introduced to the CDD managers and other clients as Plaintiffs' "administrative partner."

66.    In a further effort to control installation costs, by mid-2023, Brayman suggested that Carlson no longer maintain the role of installation manager and that Deeson Outdoor Solutions LLC ("Deeson") should undertake installation management with Carlson's participation. Deeson had previously been subcontracted by RET USA to install RET USA streetlights.

67.    Additionally, Brayman initiated weekly funding calls with HVS to discuss the "Program Summary Spreadsheet" and the "SLaaS 20-Year Income Model" that he created and shared with HVS through an online folder containing SLaaS documentation. This allowed all parties to access and reference the materials at any time and from any location.

16

68.     Throughout 2023 and well into 2024, Brayman consistently informed HVS of the ongoing challenges and repeated efforts to secure Carlson's reconciliation of the accounts, and HVS began to pressure Carlson to not only reconcile the accounts but also calculate installation costs and provide a clear accounting moving forward.

69.     Despite these efforts, Carlson continued to obstruct reconciliation, prompting Brayman to engage an independent bookkeeper and upload all records to QuickBooks for transparency in or about April 2024.

**H. Dissolution of the Brayman-Carlson Partnership at RET.**

70.     In or about March 2024, Brayman discovered that Carlson attempted to sell a competitor's solar lights through Carlson's company, Solar Carports, to an existing RET USA client without authorization.

71.     Carlson's misconduct damaged Plaintiffs' reputation and led to the loss of at least one client relationship. In response to this misconduct, in addition to his failure to reconcile bank accounts or properly calculate installation costs, Brayman sought to end his business relationship with Carlson. Soon after, Brayman proposed buyout options for Carlson's 50% interest in RET USA and SLaaS, Inc.

72.     Brayman proposed four (4) different scenarios to Carlson, both verbally and in writing: (1) Carlson could buy out Brayman's interest in RET USA and SLaaS, Inc.; (2) Brayman could buy out Carlson's interest in RET USA and SLaaS,

Inc.; (3) HVS could buy Carlson's interest in RET USA ET and SLaaS, Inc.; or (4) HVS could buy Brayman's interest in  RET USA and SLaaS, Inc.

73.    After Brayman told HVS he wanted to separate from Carlson, HVS responded that it was interested in buying Carlson's ownership stake. Afterwards, HVS began separate discussions with Carlson to acquire his interest in RET USA and SLaaS, Inc., excluding Brayman from the negotiations.

74.    By mid-2024, Carlson had effectively withdrawn from participation in RET USA's operations

75.    Throughout the remainder of 2024 and into 2025, Brayman made repeated attempts to inquire about the transaction between HVS and Carlson to no avail. Neither HVS nor Carlson divulged to Brayman the status of their discussions.

76.    HVS did, however, inform Brayman that should HVS purchase Carlson's interest, RET USA would need to assume all liability for RET USA and SLaaS, Inc., and a new company would be formed between Brayman, Abramson, and Brott.

77.    Brayman objected to the structure proposed by HVS, under which he would effectively assume all liability for Carlson.

78.    Given that Carlson had no managerial role with Plaintiffs for nearly a year, Brayman agreed, at Carlson's request, to allow Carlson to redeem his shares back to RET USA and SLaaS, Inc., in exchange for a release and indemnification.

18

79.     During the Carlson-HVS negotiations in early 2025, Brayman continued to insist on reducing Plaintiffs' agreement with HVS to writing; however, HVS refused to cooperate.

**I. Hurricane Milton and the CDDs.**

80.     After Hurricane Milton struck Florida on October 9, 2024, several CDDs and other clients sustained streetlight damage.

81.     Afterwards, three (3) clients that sustained hurricane damage began withholding monthly payments immediately following the storm that were being collected by the HVS Controller. Around the time Brayman insisted on reducing Plaintiffs' agreement with HVS to writing, HVS began to shift full responsibility for this loss of SLaaS revenue and profits onto RET USA.

82.     In addition to shifting responsibility for lost SLaaS revenue and profits from the hurricane, HVS also withheld all funding equalization payments to Plaintiffs for the manufacture and installation of streetlights, relying on internal accounting and calculations that it repeatedly declined to disclose.

83.     Following HVS's continued refusal to engage in any discussion regarding the funding balance or ongoing monthly costs, Plaintiffs notified all clients that it would assume full administrative responsibilities and commence direct collection of monthly payments.

84.    In or about April 2025, HVS began asserting multiple LSAs had been assigned to it, contradicting its prior representations, and began contacting CDDs and other of Plaintiffs' clients directly without Plaintiffs' knowledge.

85.    To Plaintiffs' knowledge, only a template of an assignment document had been circulated in the fall of 2023. Brayman, on behalf of Plaintiffs, expressly refused to assign any LSAs, and no final agreement regarding such assignments was ever reached.[2] Plaintiffs therefore retained responsibility for all dealings with its clients.

86.    HVS, with the intent of usurping Plaintiffs' ownership of the SLaaS program and related contracts, conspired to force Plaintiffs out of business by withholding all payments owed to it.

**J. Motive to Deprive Plaintiffs of Control, Ownership, and Revenue.**

87.    In late March 2025, HVS introduced RET USA to Amperage Capital ("Amperage") as a potential new partner to expand the SLaaS program. Relying on HVS's representations of good faith, RET USA disclosed proprietary data and detailed financial models pursuant to a Non-Competition and Non-Disclosure Agreement.

---

[2] The only exception to this is Brayman's execution of an assignment related to the Avalon Groves — which was not countersigned by HVS at that time. Again, this was at the urging of HVS so that it could make use of the ITC and MACRS tax credits – which HVS ultimately did not apply for.

88.     Over the course of several weeks, one of Amperage's principals repeatedly indicated to Brayman that, based on his extensive network of national-level developer contacts, there was potential to sell more than 30,000 streetlights annually under the SLaaS program.

89.     Following Amperage's detailed review of RET USA's financial model and the SLaaS program, the principal further suggested that such volume represented millions of dollars.

90.     On or about April 2, 2025, HVS invited RET USA to New York City for a meeting between the parties to discuss the overall status of the SLaaS program.

91.     Upon arrival, RET USA was surprised that two principals from Amperage were invited to attend the meeting.

92.     The Amperage principal who had previously projected the potential to sell more than 30,000 streetlights annually abruptly reversed his position and advised HVS not to invest further funds in the SLaaS program. He asserted that RET USA was being mismanaged and RET USA was unnecessary in the deal because Amperage could leverage its own contacts to manufacture the lights and finance the SLaaS program independently.

93.     Following the meeting, Brayman immediately approached Abramson and questioned him about the surprise attendance of Amperage and the derogatory statements made about RET USA to HVS.

94.    When Brayman presented Abramson with the projected income model based on Amperage's participation, Abramson stated that Plaintiffs would receive no income from the SLaaS program if Amperage became involved.

95.    Sensing a significant shift in tone, Brayman prepared a detailed summary of the encounter. Plaintiffs then provided HVS with a full reconciliation of accounts and expedited efforts to reduce the parties' relationship into a written agreement. In response, HVS submitted a conflicting accounting but refused to provide supporting documentation for its figures or calculations.

96.    Plaintiffs again requested copies of the LSA assignments that HVS had suddenly claimed were executed as Brayman had no prior knowledge of these assignments.

**K. Discovery of Fraudulent Assignments.**

97.    In August 2024, Brayman informed Carlson, both verbally and in writing, that their partnership had become irreconcilable. Brayman stated that Carlson and HVS needed to choose one of the options previously presented. Carlson and HVS agreed that the best course of action was for HVS to acquire Carlson's fifty percent (50%) ownership interest in RET USA and SLaaS, Inc.

98.    Unbeknownst to Brayman, HVS, its principals, Abramson and Brott, and Carlson had conspired to seize control of the SLaaS program and its lucrative contracts.

99.    The first stage of the Defendants' conspiracy to unlawfully take control of the SLaaS program involved fabricating a series of LSA assignment documents. These documents purported to transfer projects from Plaintiffs to HVS without any consideration or compensation to Plaintiffs. The Defendants knowingly created these false assignments, which Brayman had refused to sign until a written agreement between the parties was completed.

100.    HVS, Abramson, Brott, and Carlson were aware that Carlson lacked the authority to unilaterally execute assignments at any point during their five-year business relationship. Due to their course of dealing and performance, such authority required Brayman's approval as co-owner and Managing Partner. Nevertheless, HVS fabricated assignments after negotiations had begun for HVS to purchase Carlson's ownership interest in RET.

101.    Despite claiming in April 2025 that that LSAs were assigned from Plaintiffs to HVS, and after repeated requests to produce the purported assignments, Plaintiffs did not receive copies of the purported assignments until on or about October 8, 2025.

102.    The purported assignments themselves reveal the fraudulent nature of the Defendants' scheme.

103.    For example, six (6) of the thirteen (13) purported assignments were executed by Carlson on dates preceding RET USA's receipt of HVS's proposed

assignment template in the fall of 2023, and prior to communications in which RET USA explicitly rejected assigning the LSAs.

104.   Two (2) of the purported assignments were allegedly signed by Carlson on January 1, 2020, as a representative of RET USA —despite RET USA not being registered in the State of Wyoming until late March 2020, nearly four months after Carlson purportedly signed on its behalf.

105.   Three (3) of the purported assignments were signed on New Year's Day, including the two (2) referenced above.

106.   One (1) purported assignment was executed on a Sunday.

107.   One (1) purported assignment was dated September 2024, after Brayman and Carlson had agreed to dissolve their partnership, Carlson had ceased managing RET USA affairs, and HVS had initiated discussions to acquire Carlson's fifty percent (50%) ownership interest.

108.   One (1) purported assignment that had remained unsigned since 2019, when Hutton was the funder and which RET had repeatedly referenced as unexecuted, suddenly appeared in the batch of fabricated assignments marked as executed. Alongside it was a duplicate LSA for the same project, using a template that did not exist until three (3) years later, and signed on behalf of RET USA roughly four (4) months before RET USA was even formed.

24

109.    And one (1) purported assignment for the Palms of Serenoa, one of the two (2) original RET projects with Brookfield Kolter in 2019, was never signed, yet suddenly appeared signed on a RET USA template that did not exist in 2020 and on behalf of a company that had not even been formed.

110.    When asked in October 2025 when he had signed the assignment documents, Carlson stated he could not recall the date and suggested Brayman ask HVS.

111.    In total, HVS and Carlson fabricated thirteen (13) LSA assignments spanning from January 2020 to September 2024. After an extensive search, Brayman found no communications between HVS and Plaintiffs around the alleged signature dates to support the existence of these assignments at the time they were purportedly signed by Carlson.

112.    Critically, from late 2024 into 2025, HVS withdrew from all cooperative efforts to reconcile funding. By refusing to acknowledge legitimate debts owed to Plaintiffs, HVS deliberately withheld funds that Abramson and Brott knew were essential for Plaintiffs' cash flow.

113.    HVS also unjustifiably withheld monthly payments for support and maintenance of the SLaaS program.

114.    During this period, and without Plaintiffs' knowledge, HVS began communicating directly with Plaintiffs' clients, including CDDs and Brookfield

Kolter, falsely claiming ownership of Plaintiffs' lights and forwarding fabricated assignment documents to the CDDs.

115.   Confirming their efforts to subvert the Plaintiffs' SLaaS program and contracts, in October 2025, Brookfield Kolter's President informed RET USA that HVS had offered to replace hurricane-damaged West Port CDD streetlights "with their own lights." This offer aligned with Amperage's recommendation during the April 2, 2025 meeting in New York City, suggesting that HVS begin sourcing its lighting products through Amperage or its affiliated contacts.

116.   Brookfield Kolter also raised concerns about RET USA's financial stability, concerns apparently seeded by HVS to imply RET USA was incapable of operating independently.

117.   Additionally, in October 2025, RET USA's installer informed RET USA that HVS had approached him to remove all its equipment from the West Port CDD site, except the aluminum poles, and replace them with "other" equipment.

**L. HVS's Misconduct Results in the Termination of RET USA Contracts**

118.   In August of 2025, multiple CDDs reported conflicting claims from HVS and Plaintiffs over who owned the LSAs and streetlights.

119.   In response, Brayman, acting on behalf of Plaintiffs, promptly notified HVS that its claims of ownership over the streetlights installed in the CDDs were

improper. To Brayman's knowledge, no LSAs had ever been assigned from Plaintiffs to HVS, and therefore HVS had no legal basis to assert such ownership.

120.   This uncertainty reached a critical point in late August 2025, when Brookfield Kolter informed RET USA that it would not proceed with the installation of additional RET USA streetlights in its communities. This decision applied to both existing contracts and future projects outlined in a June 2025 agreement. Brookfield Kolter cited RET USA's deteriorating relationship with the CDDs and the confusion caused by HVS's actions as the primary reasons for its withdrawal.

121.   Further, in correspondences dated October 7, 2025, numerous CDDs contacted Plaintiffs and HVS to express their confusion as to the identity of the proper contracting party when confronted with competing invoices.

122.   For example. Deerbrook CDD wrote:

At this point, HVS and [RET USA] are making competing claims that they own the lights and that they are, in fact, the proper party to the Agreement. Indeed, both [RET USA] and HVS have sent competing invoices to Deerbrook. For example, Deerbrook received the following invoice dated September 1, 2025 from "HV Solar Lighting, LLC" with an address of 35 Joyce Lane, Woodbury, NY 11797: Invoice No. 496 in the amount of $7,150. Deerbrook also received the following invoice dated September 1, 2025 from "Solar Lighting as a Service Inc." with an address in Sarasota, Florida that indicated checks should be made payable to Joel Brayman, Recovered Energy Technologies (US) Inc.: Invoice No. 6 in the amount of $7,150.

In addition to uncertainty as to which entity is entitled to receive payments, the dueling claims leave uncertainty as to which entity is responsible (or even authorized) under the Agreement to repair or

replace damaged items and otherwise to maintain the lights. This has left Deerbrook in an untenable position.

A copy of the October 7, 2025, Deerbrook CDD's correspondence is attached as

**Exhibit "A."**

123.   On October 8, 2025, following nearly seven months of repeated requests and mounting pressure from multiple CDDs, HVS finally produced copies of the purported "assignment" documents relating to Plaintiffs' LSAs.

124.   On October 9, 2025, the President of Brookfield Kolter confirmed via email to RET USA that no further business would be conducted until RET USA resolved the issues stemming from HVS's actions and representations.

125.   Had Brayman known Carlson had conspired with HVS to falsify LSA assignments or had agreed to assign LSAs without Brayman's knowledge or consent, he would never have permitted Carlson to redeem his ownership interest in RET USA and SLaaS, Inc. in exchange for a release and indemnification.

126.   The Defendants' scheme—concealing the fabricated LSA assignments during Carlson's negotiations to separate from RET USA and SLaaS, Inc.—was deliberately designed to deprive the Plaintiffs of control, revenue, and ownership of the SLaaS program and its associated contracts.

## CAUSES OF ACTION

## COUNT I - BREACH OF CONTRACT
### (Against HVS)

127.    Plaintiffs reallege and reincorporate paragraphs 1 through 126 of the Complaint as if fully set forth herein.

128.    Plaintiffs and HVS, through words, action, course of dealing, and course of performance, entered into a contract related to the SLaaS program.

129.    Since 2019, Plaintiffs and HVS agreed that for specified projects Plaintiffs would (a) pursue solar streetlight projects; (b) obtain executed LSAs from clients; (c) share the net profit from the LSAs with HVS; and (d) provide support and maintenance for the streetlights throughout the term of the LSAs.

130.    As compensation for its obligations, Plaintiffs and HVS had agreed on a structure and financial model very early in their partnership, which was detailed in the two financial spreadsheets (i.e., the "Program Summary Spreadsheet" and the "SLaaS 20-Year Income Model") that had been created and maintained in collaboration.

131.    The financial spreadsheets provided details related to most financial aspects of the relationship, including costs associated with manufacturing, operations and maintenance to be paid by HVS and/or investors, as well as profit allocations for the 20-year term of each LSA.

132.    In the ordinary course of business, Plaintiffs submitted funding requests as needed to maintain operating cash flow, while HVS would either transfer a tranche of funds or directly pay certain expenses on behalf of Plaintiffs and the SLaaS program.

133.    The parties tracked a "balance of funding," calculated by comparing the number of streetlight systems installed against the total funds transferred to date. This balance was continuously updated, incorporated into the "SLaaS Program Numbers," accessible to all parties. The funding balance was reviewed and referenced regularly during operations.

134.    From 2019 through 2025, HVS transferred over $11 million to, *inter alia*, Plaintiffs consistent with this established model.

135.    The above-described conduct was intentional, and Plaintiffs and HVS both knew that such conduct created a contract.

136.    Plaintiffs did all, or substantially all, of the essential things which the contract required them to do.

137.    All conditions required by the contract for HVS's performance have occurred or been waived.

138.    Despite assenting to the terms described above through its conduct and course of dealing, HVS breached the contract when, among other things, it failed to acknowledge legitimate support and maintenance expenses incurred by Plaintiffs,

withheld funding equalization payments, and denied Plaintiffs' share of SLaaS revenues and profits.

139.   HVS also fabricated assignment documents to claim ownership of LSAs, contacted Plaintiffs' clients directly, and disrupted Plaintiffs' contractual relationships.

140.   As a direct result of HVS's material breaches of the contract, RET has and will suffer damages.

141.   Plaintiffs seek preliminary and permanent injunctive relief because HVS's ongoing conduct, including but not limited to, using fabricating assignment documents to deprive the Plaintiffs of control, revenue, and ownership of the SLaaS program and its associated contracts, poses immediate and irreparable harm to Plaintiffs' contractual relationships, reputation, and ability to perform under existing LSAs.

142.   Plaintiffs have a strong likelihood of success on the merits based on HVS's material breaches of the parties' agreement, as detailed above.

143.   Plaintiffs have no adequate remedy at law because monetary damages cannot restore lost client trust, prevent further misappropriation of LSAs, or ensure continued performance under long-term SLaaS projects.

144.    The balance of harms strongly favors Plaintiffs because the requested injunction merely maintains the status quo, whereas denial of injunctive relief would cause Plaintiffs irreparable harm to their business operations and contractual rights.

145.    Granting the requested injunction serves the public interest by ensuring the continued deployment and maintenance of solar streetlight infrastructure, which promotes public safety, sustainability, and reliable municipal services.

WHEREFORE, Plaintiffs demand judgment against HVS:

(a)    Awarding Plaintiffs damages to be proven at trial as a result of HVS's material breaches of the contract;

(b)    Awarding Plaintiffs pre-judgment and post-judgment interest;

(c)    Issuing a preliminary and permanent injunction compelling HVS to honor all funding obligations under the SLaaS program, including immediate payment of overdue funding equalization amounts and return and relinquish any misappropriated LSAs or related assignment documents to Plaintiffs;

(d)    Issuing a preliminary and permanent injunction prohibiting HVS from fabricating or asserting ownership over LSAs, withholding funding obligations under the SLaaS program, and interfering with Plaintiffs' client relationships; and

(e)    Granting such other relief, including any equitable relief, as this Court deems just and proper.

## COUNT II – UNJUST ENRICHMNENT
### (against HVS)

146.   Plaintiffs reallege and reincorporate paragraphs 1 through 126 of the Complaint as if fully set forth herein.

147.   This count is plead in the alternative should there be no formal contract.

148.   Plaintiffs conferred benefits on HVS by, among other things, developing, manufacturing, installing, and maintaining solar streetlights under the SLaaS program, securing LSAs with developers and CDDs, and providing ongoing support and maintenance services. Plaintiffs also granted HVS full access to banking records, financial reports, and proprietary models, enabling HVS to solicit investors and structure financing.

149.   HVS knew of the benefits and voluntarily accepted and retained the benefit by, among other things, leveraging Plaintiffs' proprietary SLaaS program, financial models, and operational infrastructure to raise millions in investor funds and positioning itself as the administrative partner to Plaintiffs' clients. HVS also collected monthly payments and profited at Plaintiffs' expense under LSAs, and exercised control over SLaaS revenues and profits.

150.   HVS's acceptance and retention of these benefits without payment to Plaintiffs would be inequitable.

151.   Equity requires that Defendant disgorge all profits, revenues, and benefits obtained through its wrongful acts.

152.   Plaintiffs seek preliminary and permanent injunctive relief because HVS's ongoing conduct, including but not limited to, using fabricating assignment documents to deprive the Plaintiffs of control, revenue, and ownership of the SLaaS program and its associated contracts, poses immediate and irreparable harm to Plaintiffs' contractual relationships, reputation, and ability to perform under existing LSAs.

153.   Plaintiffs have a strong likelihood of success on the merits based on HVS's acceptance and retention of benefits, as detailed above.

154.   Plaintiffs have no adequate remedy at law because monetary damages cannot restore lost client trust, prevent further misappropriation of LSAs, or ensure continued performance under long-term SLaaS projects.

155.   The balance of harms strongly favors Plaintiffs because the requested injunction merely maintains the status quo, whereas denial of injunctive relief would cause Plaintiffs irreparable harm to their business operations and contractual rights.

156.   Granting the requested injunction serves the public interest by ensuring the continued deployment and maintenance of solar streetlight infrastructure, which promotes public safety, sustainability, and reliable municipal services.

WHEREFORE, Plaintiffs demand judgment against HVS:

(a)    Awarding payment to Plaintiffs for the amount by which HVS was unjustly enriched;

(b)    Awarding Plaintiffs pre-judgment and post-judgment interest;

(c)    Disgorgement of all monies, profits, benefits, and other unjust gains wrongfully obtained by HVS as a result of the conduct alleged herein;

(d)    Issuing a preliminary and permanent injunction compelling HVS to honor all funding obligations under the SLaaS program, including immediate payment of overdue funding equalization amounts and return and relinquish any misappropriated LSAs or related assignment documents to Plaintiffs;

(e)    Issuing a preliminary and permanent injunction prohibiting HVS from fabricating or asserting ownership over LSAs, withholding funding obligations under the SLaaS program, and interfering with Plaintiffs' client relationships; and

(f)    Granting such other relief, including any equitable relief, as this Court deems just and proper.

## COUNT III – PROMISSORY ESTOPPEL
### (against HVS)

157.    Plaintiffs reallege and reincorporate paragraphs 1 through 126 of the Complaint as if fully set forth herein.

158.    This count is plead in the alternative should there be no formal contract.

159.    HVS made clear and definite promises to Plaintiffs.

160.    Specifically, HVS promised that Plaintiffs would (a) receive funding for manufacturing and installation of solar streetlights under the SLaaS program; (b)

share in SLaaS revenues and profits; and (c) be reimbursed for support and maintenance expenses.

161.  HVS should have expected that Plaintiffs would change their position based on the above-referenced promises. HVS knew Plaintiffs, among other things, were investing substantial resources to develop proprietary technology (e.g., the ONall365 lights), maintain installations, and secure multimillion-dollar LSAs with developers and CDDs based on the expectation of funding and profit-sharing.

162.  In reliance on HVS's promises, Plaintiffs changed their behavior and position by, among other things, manufacturing and installing hundreds of solar streetlights, maintaining inventory at Brookfield Kolter's request, providing ongoing maintenance for defective Sunna Design lights, and disclosing proprietary financial models and client relationships to HVS and its affiliates.

163.  An injustice can only be avoided by enforcing HVS's promises.

164.  Plaintiffs seek preliminary and permanent injunctive relief because HVS's ongoing conduct, including but not limited to, using fabricating assignment documents to deprive the Plaintiffs of control, revenue, and ownership of the SLaaS program and its associated contracts, poses immediate and irreparable harm to Plaintiffs' contractual relationships, reputation, and ability to perform under existing LSAs.

165.   Plaintiffs have a strong likelihood of success on the merits based on Plaintiffs' change in behavior in reliance in HVS's promises, as detailed above.

166.   Plaintiffs have no adequate remedy at law because monetary damages cannot restore lost client trust, prevent further misappropriation of LSAs, or ensure continued performance under long-term SLaaS projects.

167.   The balance of harms strongly favors Plaintiffs because the requested injunction merely maintains the status quo, whereas denial of injunctive relief would cause Plaintiffs irreparable harm to their business operations and contractual rights.

168.   Granting the requested injunction serves the public interest by ensuring the continued deployment and maintenance of solar streetlight infrastructure, which promotes public safety, sustainability, and reliable municipal services.

WHEREFORE, Plaintiffs demand judgment against HVS:

(a)    Awarding Plaintiffs reliance damages to be proven at trial;

(b)    Awarding Plaintiffs pre-judgment and post-judgment interest;

(c)    Issuing a preliminary and permanent injunction compelling HVS to honor all funding obligations under the SLaaS program, including immediate payment of overdue funding equalization amounts and return and relinquish any misappropriated LSAs or related assignment documents to Plaintiffs;

(d)    Issuing a preliminary and permanent injunction prohibiting HVS from fabricating or asserting ownership over LSAs, withholding funding obligations under the SLaaS program, and interfering with Plaintiffs' client relationships; and

(e)    Granting such other relief, including any equitable relief, as this Court deems just and proper.

### COUNT IV – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (against HVS)

169.   Plaintiffs reallege and reincorporate paragraphs 1 through 126 of the Complaint as if fully set forth herein.

170.   Plaintiffs and HVS, through words, action, course of dealing, and course of performance, entered into a contract related to the SLaaS program.

171.   Since 2019, Plaintiffs and HVS agreed that for specified projects Plaintiffs would (a) pursue solar streetlight projects; (b) obtain executed LSAs from clients; (c) share the net profit from the LSAs with HVS; and (d) provide support and maintenance for the streetlights throughout the operative timeframe of the LSAs.

172.   Plaintiffs and HVS had agreed on a structure and financial model very early in their partnership, which was detailed in the two financial spreadsheets (i.e., the "Program Summary Spreadsheet" and the "SLaaS 20-Year Income Model") that had been created and maintained in collaboration.

173.   The financial spreadsheets provided details related to most financial aspects of the relationship, including costs associated with manufacturing, operations and maintenance, as well as profit allocations for the 20-year term of each LSA.

174.   In the ordinary course of business, Plaintiffs submitted funding requests as needed to maintain operating cash flow, while HVS would either transfer a tranche of funds or directly pay certain expenses on behalf of Plaintiffs and the SLaaS program.

175.   The parties tracked a "balance of funding," calculated by comparing the number of streetlight systems installed against the total funds transferred to date. This balance was continuously updated, incorporated into the "SLaaS Program Numbers," accessible to all parties. The funding balance was reviewed and referenced regularly during operations.

176.   From 2019 through 2025, HVS transferred over $11 million to, *inter alia*, Plaintiffs consistent with this established model.

177.   The above-described conduct was intentional, and Plaintiffs and HVS both knew that such conduct created a contract.

178.   Plaintiffs did all, or substantially all, of the essential things which the contract required them to do.

179.   All conditions required by the contract for HVS's performance have occurred or been waived.

180.   Under Florida law, all contracts contain an implied covenant of good faith and fair dealing.

181.   HVS's conduct was not consistent with the parties' reasonable expectations by, including but not limited to:

a) Withholding funding equalization payments and refusing to acknowledge legitimate support and maintenance expenses;

b) Fabricating assignment documents to falsely claim ownership of LSAs and SLaaS revenues and profits;

c) Contacting Plaintiffs' clients directly and creating market confusion, resulting in the suspension of multimillion-dollar contracts;

d) Refusing to reconcile funding balances and provide transparency regarding amounts owed; and

e) Conspiring to exclude Plaintiffs from the SLaaS program and divert its revenue and opportunities to HVS and third parties.

182.   Plaintiffs have a strong likelihood of success on the merits based on HVS's breaches of the implied covenant of good faith and fair dealing, as detailed above.

183.    Plaintiffs have no adequate remedy at law because monetary damages cannot restore lost client trust, prevent further misappropriation of LSAs, or ensure continued performance under long-term SLaaS projects.

184.    The balance of harms strongly favors Plaintiffs because the requested injunction merely maintains the status quo, whereas denial of injunctive relief would cause Plaintiffs irreparable harm to their business operations and contractual rights.

185.    Granting the requested injunction serves the public interest by ensuring the continued deployment and maintenance of solar streetlight infrastructure, which promotes public safety, sustainability, and reliable municipal services.

WHEREFORE, Plaintiffs demand judgment against HVS:

(a)    Awarding Plaintiffs damages to be proven at trial;

(b)    Awarding Plaintiffs pre-judgment and post-judgment interest;

(c)    Issuing a preliminary and permanent injunction compelling HVS to honor all funding obligations under the SLaaS program, including immediate payment of overdue funding equalization amounts and return and relinquish any misappropriated LSAs or related assignment documents to Plaintiffs;

(d)    Issuing a preliminary and permanent injunction prohibiting HVS from fabricating or asserting ownership over LSAs, withholding funding obligations under the SLaaS program, and interfering with Plaintiffs' client relationships; and

(e)    Granting such other relief, including any equitable relief, as this Court deems just and proper.

## COUNT V – TORTIOUS INTERFERENCE WITH
## CONTRACTUAL RELATIONS
### (against Defendants)

186.    Plaintiffs reallege and reincorporate paragraphs 1 through 126 of the Complaint as if fully set forth herein.

187.    Plaintiffs maintained valid and enforceable LSAs with, among others, the following CDDs, developers, and other clients including: Avalon Groves CDD, Deerbrook CDD, Hammock Oaks CDD, Nexus TN South Home Owners Association, Inc., Nexus TN North Home Owners Association, Inc., Pacific Ace CDD, Palms of Serenoa CDD, Twisted Oaks CDD, Summerwoods CDD, West Port CDD, and Brookfield Kolter, for the installation, maintenance, and operation of solar streetlights under the SLaaS program.

188.    Defendants had actual knowledge of these LSAs by, among other things, having participated in funding operations, received weekly financial reports, and maintained full access to Plaintiffs' proprietary financial models and bank accounts.

189.    Defendants intentionally, maliciously, and unjustifiably interfered with Plaintiffs' LSAs by, including but not limited to:

a) Fabricating thirteen (13) LSA assignment documents, purporting to transfer Plaintiffs' rights to HVS without consideration or consent;

b) Having Carlson execute these fabricated assignments despite lacking authority and after agreeing to redeem his ownership interest;

c) Communicating directly with CDDs and Brookfield Kolter, falsely claiming ownership of Plaintiffs' contractual rights;

d) Issuing competing invoices to CDDs, creating confusion as to the proper contracting party and payment recipient; and

e) Withholding SLaaS revenues and profits and funding owed to Plaintiffs under the LSAs.

190.    Defendants acted with a malice and conspiratorial motive to usurp Plaintiffs' SLaaS program and related contracts by, including but not limited to:

a) Concealing fabricated assignments during Carlson's negotiations to redeem his ownership interest;

b) Coordinating with Amperage to undermine Plaintiffs' reputation and position HVS as the sole operator of the existing contracts under the SLaaS program; and

c) Exploiting hurricane-related disputes to pressure Plaintiffs and induce developers to terminate or delay contracted projects.

191.   HVS interfered with the above-referenced contractual relationships to induce or otherwise cause them to the CDDs, developers, and other clients to breach their LSAs.

192.   As a direct and legal result of Defendants' malicious interference, Plaintiffs have and continue to suffer damages, including but not limited to Brookfield Kolter suspending multi-million-dollar projects, lost revenue streams, withheld payments under the SLaaS program, and damage to Plaintiffs' business reputation and relationships.

193.   Plaintiffs have a strong likelihood of success on the merits based on Defendants' tortious interference with contractual relations, as detailed above.

194.   Plaintiffs have no adequate remedy at law because monetary damages cannot restore lost client trust, prevent further misappropriation of LSAs, or ensure continued performance under long-term SLaaS projects.

195.   The balance of harms strongly favors Plaintiffs because the requested injunction merely maintains the status quo, whereas denial of injunctive relief would cause Plaintiffs irreparable harm to their business operations and contractual rights.

196.   Granting the requested injunction serves the public interest by ensuring the continued deployment and maintenance of solar streetlight infrastructure, which promotes public safety, sustainability, and reliable municipal services.

WHEREFORE, Plaintiffs demand judgment against Defendants:

(a)     Awarding Plaintiffs damages to be proven at trial;

(b)     Awarding Plaintiffs pre-judgment and post-judgment interest;

(c)     Awarding punitive damages;

(d)     Disgorgement of all monies, profits, benefits, and other unjust gains wrongfully obtained by Defendants as a result of the conduct alleged herein;

(e)     Issuing a preliminary and permanent injunction compelling Defendants to honor all funding obligations under the SLaaS program, including immediate payment of overdue funding equalization amounts and return and relinquish any misappropriated LSAs or related assignment documents to Plaintiffs;

(f)     Issuing a preliminary and permanent injunction prohibiting Defendants from fabricating or asserting ownership over any LSA, withholding funding obligations under the SLaaS program, and interfering with Plaintiffs' client relationships; and

(g)     Granting such other relief, including any equitable relief, as this Court deems just and proper.

## COUNT VI – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
### (against Defendants)

197.   Plaintiffs reallege and reincorporate paragraphs 1 through 126 of the Complaint as if fully set forth herein.

198.   Plaintiffs maintained actual advantageous business relationships with Brookfield Kolter, Pulte Homes, Taylor Morrison, Dream Finders, Meritage Homes, and Khonavaniain, among others, which had already and were expected to further yield substantial future projects and revenue.

199.   Defendants had actual knowledge of these relationships by, among other things, having participated in negotiations, reviewed proprietary financial models, and attended meetings with potential partners such as Amperage.

200.   Defendants intentionally, maliciously, and unjustifiably interfered with Plaintiffs' business relationships by, including but not limited to:

a) Coordinating with Amperage to undermine Plaintiffs' reputation and position HVS as the sole operator of the SLaaS program;

b) Making false statements to Brookfield Kolter regarding Plaintiffs' financial stability and ownership of streetlights;

c) Creating market confusion through competing invoices and claims of ownership, causing Brookfield Kolter, Pulte Homes, Taylor Morrison, Dream Finders, Meritage Homes, and Khonavaniain, among others, to suspend further installations; and

d) Exploiting hurricane-related disputes to pressure Plaintiffs and induce developers to terminate or delay future projects.

201.    Defendants interfered with the above-referenced business relationships to induce or otherwise cause them to terminate their relationship with Plaintiffs so Defendants could profit at Plaintiffs' expense.

202.    As a direct and legal result of Defendants' malicious interference, Plaintiffs have and continue to suffer damages, including but not limited to Brookfield Kolter suspending multi-million-dollar projects, lost revenue streams, withheld payments under the SLaaS program, and damage to Plaintiffs' business reputation and relationships.

203.    Plaintiffs have a strong likelihood of success on the merits based on Defendants' tortious interference with business relations, as detailed above.

204.    Plaintiffs have no adequate remedy at law because monetary damages cannot restore lost client trust, prevent further misappropriation of LSAs, or ensure continued performance under long-term SLaaS projects.

205.    The balance of harms strongly favors Plaintiffs because the requested injunction merely maintains the status quo, whereas denial of injunctive relief would cause Plaintiffs irreparable harm to their business operations and contractual rights.

206.    Granting the requested injunction serves the public interest by ensuring the continued deployment and maintenance of solar streetlight infrastructure, which promotes public safety, sustainability, and reliable municipal services.

WHEREFORE, Plaintiffs demand judgment against Defendants:

(a)    Awarding Plaintiffs damages to be proven at trial;

(b)    Awarding Plaintiffs punitive damages;

(c)    Disgorgement of all monies, profits, benefits, and other unjust gains wrongfully obtained by Defendants as a result of the conduct alleged herein;

(d)    Awarding Plaintiffs pre-judgment and post-judgment interest;

(e)    Issuing a preliminary and permanent injunction compelling Defendants to honor all funding obligations under the SLaaS program, including immediate payment of overdue funding equalization amounts and return and relinquish any misappropriated LSAs or related assignment documents to Plaintiffs;

(f)    Issuing a preliminary and permanent injunction prohibiting Defendants from fabricating or asserting ownership over any LSA, withholding funding obligations under the SLaaS program, and interfering with Plaintiffs' client relationships; and

(g)    Granting such other relief, including any equitable relief, as this Court deems just and proper.

## COUNT VII – FRAUD
### (against HVS, Abramson, and Brott)

207.    Plaintiffs reallege and reincorporate paragraphs 1 through 126 of the Complaint as if fully set forth herein.

208.    Abramson and Brott, on behalf of HVS, made false statements of material fact when in or about late 2024 and early 2025 it fabricated LSA assignment

48

documents purporting to transfer Plaintiffs' contracts to HVS without consideration or consent.

209.   HVS, Abramson, and Brott knew these statements were false because they knowingly participated in creating the fabricated assignments and having Carlson sign them, despite knowing that such authority required Brayman's approval as co-owner and Managing Partner. The assignments were additionally false as they were made without Brayman's consent pursuant to Fla. Stat. § 607.1202 as the remaining fifty (50%) shareholder considering the LSAs were substantially all of the Plaintiffs' assets.

210.   The statements were made with the intent of inducing Plaintiffs to engage in manufacturing, installing, and maintaining streetlights while concealing Defendants' plan to usurp ownership.

211.   Plaintiffs justifiably relied on these statements by continuing to manufacture, install, and maintain streetlights in the CDDs and disclose proprietary financial models under the belief that their ownership and profit rights were secure.

212.   As a direct and legal result of Plaintiffs' reliance, Plaintiffs have and will continue to suffer damages, including, but not limited to, Brookfield Kolter suspending multi-million-dollar projects, lost revenue streams and profit, withheld payments under the SLaaS program, and damage to Plaintiffs' business reputation and relationships.

213.  Plaintiffs have a strong likelihood of success on the merits based on HVS, Abramson, and Brott's fraudulent conduct, as detailed above.

214.  Plaintiffs have no adequate remedy at law because monetary damages cannot restore lost client trust, prevent further misappropriation of LSAs, or ensure continued performance under long-term SLaaS projects.

215.  The balance of harms strongly favors Plaintiffs because the requested injunction merely maintains the status quo, whereas denial of injunctive relief would cause Plaintiffs irreparable harm to their business operations and contractual rights.

216.  Granting the requested injunction serves the public interest by ensuring the continued deployment and maintenance of solar streetlight infrastructure, which promotes public safety, sustainability, and reliable municipal services.

WHEREFORE, Plaintiffs demand judgment against HVS, Abramson, and Brott:

(a)    Awarding Plaintiffs damages to be proven at trial;

(b)    Awarding Plaintiffs punitive damages;

(c)    Disgorgement of all monies, profits, benefits, and other unjust gains wrongfully obtained by HVS, Abramson, and Brott as a result of the conduct alleged herein;

(d)    Awarding Plaintiffs pre-judgment and post-judgment interest;

(e)    Issuing a preliminary and permanent injunction prohibiting HVS, Abramson and Brott from fabricating or asserting ownership over any LSA, withholding funding obligations under the SLaaS program, and interfering with Plaintiffs' client relationships; and

(f)    Granting such other relief, including any equitable relief, as this Court deems just and proper.

## COUNT VIII – FRAUD
### (against Carlson)

217.  Plaintiffs reallege and reincorporate paragraphs 1 through 126 of the Complaint as if fully set forth herein.

218.  Carlson made false statements of material fact when in or about late 2024 and early 2025 when he signed and participated in creating fabricated LSA assignment documents purporting to transfer Plaintiffs' contracts to HVS without consideration or consent.

219.  Carlson knew these statements were false because he knowingly participated in creating the fabricated assignments and signing them, despite knowing that such authority required Brayman's approval as co-owner and Managing Partner. The assignments were additionally false as they were made without Brayman's consent pursuant to Fla. Stat. § 607.1202 as the remaining fifty (50%) shareholder considering the LSAs were substantially all of the Plaintiffs' assets.

220.   Carlson concealed the existence of these fabricated assignments while negotiating his indemnification and release from RET USA and SLaaS, Inc., with the intent to induce Brayman to release and indemnify him.

221.   Carlson acted with the intent to create the appearance that HVS owned Plaintiffs' contracts, thereby undermining Plaintiffs' relationship with CDDs, Brookfield Kolter and others.

222.   Plaintiffs justifiably relied on Carlson's misrepresentations and omissions when agreeing to release and indemnify him from RET USA and SLaaS, Inc. Had Plaintiffs known that Carlson knowingly signed and participated in creating the fabricated assignment documents they would not have released and indemnified him.

223.   As a direct and legal cause of Carlson's misrepresentations and omissions, Plaintiffs have and will continue to suffer damages, including, but not limited to, Brookfield Kolter suspending multi-million-dollar projects, lost revenue streams and profit, withheld payments under the SLaaS program, and damage to Plaintiffs' business reputation and relationships.

224.   Plaintiffs have a strong likelihood of success on the merits based on Carlson's fraudulent conduct, as detailed above.

225.   Plaintiffs have no adequate remedy at law because monetary damages cannot restore lost client trust or prevent further misappropriation of LSAs.

226.    The balance of harms strongly favors Plaintiffs because the requested injunction merely maintains the status quo, whereas denial of injunctive relief would cause Plaintiffs irreparable harm to their business operations and contractual rights.

227.    Granting the requested injunction serves the public interest by ensuring the continued deployment and maintenance of solar streetlight infrastructure, which promotes public safety, sustainability, and reliable municipal services.

WHEREFORE, Plaintiffs demand judgment against Carlson:

(a)     Awarding Plaintiffs damages to be proven at trial;

(b)     Awarding Plaintiffs punitive damages;

(c)     Disgorgement of all monies, profits, benefits, and other unjust gains wrongfully obtained by Carlson as a result of the conduct alleged herein;

(d)     Awarding Plaintiffs pre-judgment and post-judgment interest;

(e)     Issuing a preliminary and permanent injunction prohibiting Carlson from transferring ownership of any LSA or interfering with RET USA's client relationships; and

(f)     Granting such other relief, including any equitable relief, as this Court deems just and proper.

## COUNT IX – CIVIL CONSPIRACY TO COMMIT FRAUD
### (against Defendants)

228.    Plaintiffs reallege and reincorporate paragraphs 1 through 126 of the Complaint as if fully set forth herein.

53

229.    Defendants combined, conspired, and agreed among themselves to accomplish an unlawful act or a lawful act by unlawful means, specifically to deprive Plaintiffs of ownership, control, and revenue from the SLaaS program and related contracts.

230.    As part of this conspiracy, Defendants engaged in overt acts, including but not limited to:

a)  Fabricating thirteen (13) LSA assignment documents purporting to transfer Plaintiffs' contracts to HVS without consideration or consent;

b)  Concealing the existence of these fabricated assignments during negotiations for Carlson's redemption of his ownership interest in Plaintiffs' entities;

c)  Misrepresenting to Plaintiffs, CDDs, and Brookfield Kolter that HVS owned Plaintiffs' streetlights and LSAs;

d)  Contacting Plaintiffs' clients directly, forwarding doctored assignment documents, and issuing competing invoices to create market confusion;

e)  Withholding funds owed to Plaintiffs for manufacturing, installation, and maintenance under the SLaaS program, despite prior agreements and course of dealing; and

f)  Engaging Amperage to undermine Plaintiffs' business relationships and position HVS as the sole operator of the SLaaS program.

231. Defendants acted with the specific intent to injure Plaintiffs and to unlawfully appropriate Plaintiffs' contracts, proprietary technology, revenue streams, and profit.

232. As a direct and legal cause of Defendants' conspiracy and overt acts, Plaintiffs have and will continue to suffer damages, including but not limited to Brookfield Kolter suspending multi-million-dollar projects, lost revenue streams and profit, withheld payments under the SLaaS program, and damage to Plaintiffs' business reputation and relationships.

233. Plaintiffs have a strong likelihood of success on the merits based on Defendants' conspiratorial conduct, as detailed above.

234. Plaintiffs have no adequate remedy at law because monetary damages cannot restore lost client trust, prevent further misappropriation of LSAs, or ensure continued performance under long-term SLaaS projects.

235. The balance of harms strongly favors Plaintiffs because the requested injunction merely maintains the status quo, whereas denial of injunctive relief would cause Plaintiffs irreparable harm to their business operations and contractual rights.

236. Granting the requested injunction serves the public interest by ensuring the continued deployment and maintenance of solar streetlight infrastructure, which promotes public safety, sustainability, and reliable municipal services.

WHEREFORE, Plaintiffs demand judgment against Defendants:

Awarding Plaintiffs damages to be proven at trial:

(a)    Awarding Plaintiffs damages to be proven at trial;

(b)    Awarding Plaintiffs punitive damages;

(c)    Disgorgement of all monies, profits, benefits, and other unjust gains wrongfully obtained by Defendants as a result of the conduct alleged herein;

(d)    Awarding Plaintiffs pre-judgment and post-judgment interest;

(e)    Issuing a preliminary and permanent injunction compelling Defendants to honor all funding obligations under the SLaaS program, including immediate payment of overdue funding equalization amounts and return and relinquish any misappropriated LSAs or related assignment documents to Plaintiffs;

(f)    Issuing a preliminary and permanent injunction prohibiting Defendants from fabricating or asserting ownership over any LSA, withholding funding obligations under the SLaaS program, and interfering with Plaintiffs' client relationships; and

(g) Granting such other relief, including any equitable relief, as this Court deems just and proper.

## COUNT X – AIDING AND ABETTING FRAUD
### (against Abramson and Brott)

237.    Plaintiffs reallege and reincorporate paragraphs 1 through 126 of the Complaint as if fully set forth herein.

238. At all relevant times, HVS and/or Carlson engaged in fraudulent conduct, including but not limited to:

    a) Fabricating thirteen (13) LSA assignment documents purporting to transfer Plaintiffs' contracts without consent or consideration;/or

    b) Misrepresenting to Plaintiffs, CDDs, and Brookfield Kolter that HVS owned Plaintiffs' SLaaS program and streetlights;

    c) Presenting fabricated assignments to Plaintiffs' clients, including CDDs and Brookfield Kolter, thereby creating market confusion and undermining Plaintiffs' contractual relationship;

    d) Concealing the existence of fabricated assignments during Carlson's redemption negotiations; and

    e) Issuing competing invoices to CDDs to create market confusion and undermine Plaintiffs' contractual rights.

239. Abramson and Brott knew of this fraudulent scheme and substantially assisted and encouraged its execution by, including but not limited to:

    a) Drafting and circulating assignment templates later used to fabricate LSA assignments;

    b) Coordinating communications with Amperage to position HVS as the sole operator of the SLaaS program;

    c) Providing strategic guidance to HVS and Carlson on asserting false ownership claims and discrediting Plaintiff; and

    d) Leveraging investor relationships to secure funding based on misappropriated contracts.

240.   Abramson and Brott's substantial assistance were a direct and legal cause of Plaintiffs' damages, including but not limited to Brookfield Kolter suspending multi-million-dollar projects, lost revenue streams and profits, withheld payments under the SLaaS program, and damage to Plaintiffs' business reputation and relationships.

241.   Plaintiffs have a strong likelihood of success on the merits based on Abramson and Brott's fraudulent conduct, as detailed above.

242.   Plaintiffs have no adequate remedy at law because monetary damages cannot restore lost client trust, prevent further misappropriation of LSAs, or ensure continued performance under long-term SLaaS projects.

243.   The balance of harms strongly favors Plaintiffs because the requested injunction merely maintains the status quo, whereas denial of injunctive relief would cause Plaintiffs irreparable harm to their business operations and contractual rights.

244.   Granting the requested injunction serves the public interest by ensuring the continued deployment and maintenance of solar streetlight infrastructure, which promotes public safety, sustainability, and reliable municipal services.

WHEREFORE, Plaintiffs demand judgment against Abramson and Brott:

Awarding Plaintiffs damages to be proven at trial:

(a)     Awarding Plaintiffs damages to be proven at trial;

(b)     Awarding Plaintiffs punitive damages;

(c)     Disgorgement of all monies, profits, benefits, and other unjust gains wrongfully obtained by Abramson and Brott as a result of the conduct alleged herein;

(d)     Awarding Plaintiffs pre-judgment and post-judgment interest;

(e)     Issuing a preliminary and permanent injunction prohibiting Abramson and Brott, individually or through HVS, from fabricating or asserting ownership over any LSA, withholding funding obligations under the SLaaS program, and interfering with Plaintiffs' client relationships; and

(f)     Granting such other relief, including any equitable relief, as this Court deems just and proper.

## COUNT XI – AIDING AND ABETTING FRAUD
### (against HVS)

245.   Plaintiffs reallege and reincorporate paragraphs 1 through 126 of the Complaint as if fully set forth herein.

246.   At all relevant times, Carlson and/or Abramson and Brott engaged in fraudulent conduct, including but not limited to:

a) Drafting and circulating assignment templates later used to fabricate LSA assignments;

b) Executing fabricated assignment documents on behalf of RET and RET USA, knowing such documents were unauthorized and contrary to Plaintiffs' stated position;

c) Coordinating communications with Amperage to position HVS as the sole operator of the SLaaS program;

d) Providing strategic guidance to HVS and Carlson on asserting false ownership claims and discrediting Plaintiff; and

e) Leveraging investor relationships to secure funding based on misappropriated contracts.

f) Presenting fabricated assignments to Plaintiffs' clients, including CDDs and Brookfield Kolter, thereby creating market confusion and undermining Plaintiffs' contractual relationships; and

g) Concealing the existence of these fabricated assignments during negotiations to redeem his ownership interest in RET USA and SLaaS, Inc., and requesting a release and indemnification to shield himself from liability.

247. HVS knew of this fraudulent scheme and substantially assisted and encouraged its commission by, including but not limited to:

a) Directing Carlson to execute fabricated assignments;

b) Concealing the fraudulent nature of the assignments from Plaintiffs for nearly seven months while asserting ownership of Plaintiffs' assets;

c) Communicating directly with Plaintiffs' clients, forwarding doctored assignment documents, and issuing competing invoices to create market confusion;

d) Withholding funds owed to Plaintiffs for manufacturing, installation, and maintenance under the SLaaS program, leveraging the fabricated assignments as justification; and

e) Issuing competing invoices to Plaintiffs' clients to create market confusion and undermine Plaintiffs' contractual rights.

248.   HVS's substantial assistance was a direct and legal cause of Plaintiffs' damages, including but not limited to Brookfield Kolter suspending multi-million-dollar projects, lost revenue streams and profits, withheld payments under the SLaaS program, and damage to Plaintiffs' business reputation and relationships.

249.   Plaintiffs have a strong likelihood of success on the merits based on HVS's fraudulent conduct, as detailed above.

250.   Plaintiffs have no adequate remedy at law because monetary damages cannot restore lost client trust, prevent further misappropriation of LSAs, or ensure continued performance under long-term SLaaS projects.

251.   The balance of harms strongly favors Plaintiffs because the requested injunction merely maintains the status quo, whereas denial of injunctive relief would cause Plaintiffs irreparable harm to their business operations and contractual rights.

252.   Granting the requested injunction serves the public interest by ensuring the continued deployment and maintenance of solar streetlight infrastructure, which promotes public safety, sustainability, and reliable municipal services.

WHEREFORE, Plaintiffs demand judgment against Abramson and Brott:

Awarding Plaintiffs damages to be proven at trial:

(a)    Awarding Plaintiffs damages to be proven at trial;

(b)    Awarding Plaintiffs punitive damages;

(c)    Disgorgement of all monies, profits, benefits, and other unjust gains wrongfully obtained by HVS as a result of the conduct alleged herein;

(d)    Awarding Plaintiffs pre-judgment and post-judgment interest;

(e)    Issuing a preliminary and permanent injunction prohibiting HVS from fabricating or asserting ownership over LSA, withholding funding obligations under the SLaaS program, and interfering with Plaintiffs' client relationships; and

(f)    Granting such other relief, including any equitable relief, as this Court deems just and proper.

## COUNT XII – AIDING AND ABETTING FRAUD
### (against Carlson)

253.   Plaintiffs reallege and reincorporate paragraphs 1 through 126 of the Complaint as if fully set forth herein.

254.   At all relevant times, HVS, together with Abramson and Brott, engaged in fraudulent conduct, including but not limited to:

a) Drafting and circulating assignment templates later used to fabricate LSA assignments;

b) Directing Carlson to execute fabricated assignments;

c) Concealing the fraudulent nature of the assignments from Plaintiffs for nearly seven months while asserting ownership of Plaintiffs' assets;

d) Communicating directly with Plaintiffs' clients, forwarding doctored assignment documents, and issuing competing invoices to create market confusion;

e) Withholding funds owed to Plaintiffs for manufacturing, installation, and maintenance under the SLaaS program, leveraging the fabricated assignments as justification;

f) Issuing competing invoices to Plaintiffs' clients to create market confusion and undermine Plaintiffs' contractual rights;

g) Coordinating communications with Amperage to position HVS as the sole operator of the SLaaS program;

h) Providing strategic guidance to HVS and Carlson on asserting false ownership claims and discrediting Plaintiff; and

i) Leveraging investor relationships to secure funding based on misappropriated contracts.

255.    Carlson knew of this fraudulent scheme and substantially assisted and encouraged its commission by, including but not limited to:

a) Executing fabricated assignment documents on behalf of RET and RET USA, knowing such documents were unauthorized and contrary to Plaintiffs' stated position.

b) Presenting fabricated assignments to Plaintiffs' clients, including CDDs and Brookfield Kolter, thereby creating market confusion and undermining Plaintiffs' contractual relationships.

c) Concealing the existence of these fabricated assignments during negotiations to redeem his ownership interest in RET USA and SLaaS, Inc., and requesting a release and indemnification to shield himself from liability.

256.    Carlson's substantial assistance was a direct and legal cause of Plaintiffs' damages, including but not limited to Brookfield Kolter suspending multi-million-dollar projects, lost revenue streams and profits, withheld payments under the SLaaS program, and damage to Plaintiffs' business reputation and relationships.

257.   Plaintiffs have a strong likelihood of success on the merits based on HVS's fraudulent conduct, as detailed above.

258.   Plaintiffs have no adequate remedy at law because monetary damages cannot restore lost client trust, prevent further misappropriation of LSAs, or ensure continued performance under long-term SLaaS projects.

259.   The balance of harms strongly favors Plaintiffs because the requested injunction merely maintains the status quo, whereas denial of injunctive relief would cause Plaintiffs irreparable harm to their business operations and contractual rights.

260.   Granting the requested injunction serves the public interest by ensuring the continued deployment and maintenance of solar streetlight infrastructure, which promotes public safety, sustainability, and reliable municipal services.

WHEREFORE, Plaintiffs demand judgment against Abramson and Brott:

  Awarding Plaintiffs damages to be proven at trial:

  (a)    Awarding Plaintiffs damages to be proven at trial;

  (b)    Awarding Plaintiffs punitive damages;

  (c)    Disgorgement of all monies, profits, benefits, and other unjust gains wrongfully obtained by Carlson as a result of the conduct alleged herein;

  (d)    Awarding Plaintiffs pre-judgment and post-judgment interest;

(e)    Issuing a preliminary and permanent injunction prohibiting Carlson from fabricating, transferring, or asserting ownership over any LSA or interfering with Plaintiffs' client relationships; and

(f)    Granting such other relief, including any equitable relief, as this Court deems just and proper.

### COUNT XIII – CONVERSION
### (against HVS)

261.   Plaintiffs reallege and reincorporate paragraphs 1 through 126 of the Complaint as if fully set forth herein.

262.   Plaintiffs had ownership and a right to possess a) SLaaS revenues and profits collected under the LSAs with developers, CDDs and other clients; (b) funding equalization payments for manufacturing and installation costs; and (c) ownership and control of solar streetlights installed under the SLaaS program.

263.   HVS had an obligation to keep the SLaaS revenues and profits and funding equalization payments intact and deliver the specific funds in question so that the funds could be identified.

264.   HVS has wrongfully asserted dominion over that property by (a) withholding identifiable SLaaS revenues and profits and monthly payments collected from CDDs, (b) refusing to remit and deliver funding equalization payments, and (c) asserting ownership over Plaintiffs' LSAs and installed streetlights by fabricating assignment documents.

265.   HVS's actions are unauthorized and inconsistent with Plaintiff's rights. Plaintiffs never executed any valid assignment of LSAs to HVS, and no agreement granted HVS ownership of Plaintiffs' equipment or contractual rights. HVS's conduct was deliberate and intended to deprive Plaintiffs of their property and revenue streams.

266.   As a direct and legal result of HVS's conversion, Plaintiffs have suffered damages, including but not limited to the deprivation of Plaintiff's property and revenue.

WHEREFORE, Plaintiffs demand judgment against Abramson and Brott:

Awarding Plaintiffs damages to be proven at trial:

(a) Awarding Plaintiffs damages to be proven at trial;

(b) Awarding Plaintiffs punitive damages;

(c) Awarding Plaintiffs pre-judgment and post-judgment interest; and

(d) Granting such other relief, including any equitable relief, as this Court deems just and proper.

## COUNT XIV – BREACH OF FIDUCIARY DUTY
### (against Carlson)

267.   Plaintiffs reallege and reincorporate paragraphs 1 through 126 of the Complaint as if fully set forth herein.

268.   As co-owner and director of RET and RET USA, Carlson owed duties of loyalty, care, and good faith to Plaintiffs, including the obligation to act in

Plaintiffs' best interests, avoid self-dealing, and refrain from actions that would harm Plaintiffs' business.

269.   Carlson breached his fiduciary duties to Plaintiffs by failing to act with the utmost good faith, fairness, and honesty when he engaged in conduct adverse to Plaintiffs' interest, including but not limited to:

a)  Failing to reconcile accounts and properly manage installation costs despite repeated requests and business needs, causing financial disarray and loss;

b)  Participating in the fabrication of assignment documents purporting to transfer Plaintiffs' LSAs to HVS against the companies' interests and for his own financial gain in violation of Florida law;

c)  Colluding with HVS to negotiate the sale of his ownership interest in RET USA and SLaaS, Inc. while excluding Brayman and concealing material information; and

d)  Seeking a release and indemnification from RET USA and SLaaS, Inc. while concealing the existence of fabricated assignment documents.

270.   Carlson breached his fiduciary duties to Plaintiffs by acting outside the scope of his authority and in direct conflict with Plaintiffs' interests to benefit himself and HVS, including positioning himself for a buyout and shielding himself from liability.

271.  In doing so, Carlson failed to protect the financial interests of Plaintiffs and used his position to the detriment of Plaintiffs.

272.  As a direct and legal consequence of Carlson's breach of his fiduciary duties, Plaintiffs have and will suffer damages, including but not limited to contractual rights, revenue streams and profits, and business opportunities, and incurred costs to address market confusion and protect their interests.

273.  Plaintiffs have a strong likelihood of success on the merits based on Carlson's breaches of his fiduciary duty to Plaintiffs, as detailed above.

274.  Plaintiffs have no adequate remedy at law because monetary damages cannot restore lost client trust, prevent further misappropriation of LSAs, or ensure continued performance under long-term SLaaS projects.

275.  The balance of harms strongly favors Plaintiffs because the requested injunction merely maintains the status quo, whereas denial of injunctive relief would cause Plaintiffs irreparable harm to their business operations and contractual rights.

276.  Granting the requested injunction serves the public interest by ensuring the continued deployment and maintenance of solar streetlight infrastructure, which promotes public safety, sustainability, and reliable municipal services.

WHEREFORE, Plaintiffs demand judgment against Abramson and Brott:

Awarding Plaintiffs damages to be proven at trial:

(a)    Awarding Plaintiffs damages to be proven at trial;

(b)    Awarding Plaintiffs punitive damages;

(c)    Awarding Plaintiffs pre-judgment and post-judgment interest;

(d) Issuing a preliminary and permanent injunction prohibiting Carlson from fabricating, transferring or asserting ownership over any LSA or interfering with Plaintiffs' client relationships; and

(e) Granting such other relief, including any equitable relief, as this Court deems just and proper.

## COUNT XV – BREACH OF FIDUCIARY DUTY
### (against HVS)

277.    Plaintiffs reallege and reincorporate paragraphs 1 through 126 of the Complaint as if fully set forth herein.

278.    Plaintiffs and HVS entered into a long-term business relationship beginning in 2019 on specified projects to jointly develop and fund solar streetlight projects under the SLaaS program.

279.    HVS assumed a position of trust and confidence by, including but not limited to:

a)  Controlling funding flows for Plaintiffs' operations;

b)  Having full access to Plaintiffs' bank accounts and financial records;

c)  Participating in billing and collections on Plaintiffs; and

    d) Acting as Plaintiffs' administrative partner and point of contact with third parties, including to broker financial investments from third parties or other capital infusions.

280. By virtue of this special relationship, HVS owed Plaintiffs fiduciary duties of loyalty, good faith, candor, and fair dealing, including the duty to:

    a) Act in Plaintiffs' best interests.

    b) Avoid self-dealing and conflicts of interest.

    c) Disclose material facts affecting Plaintiffs' rights and obligations.

    d) Refrain from conduct intended to harm Plaintiffs' business.

281. HVS breached its fiduciary duties by failing to act with the utmost good faith, fairness, and honesty by engaging in the following acts, including but not limited to:

    a) Conspiring with Carlson to fabricate LSA assignment documents purporting to transfer Plaintiffs' contracts to HVS without consideration or consent;

    b) Attempting to seize control of the SLaaS program and related contracts by falsely claiming ownership of Plaintiffs' streetlights and LSAs;

    c) Refusing to acknowledge legitimate support and maintenance expenses and withholding equalization payments owed to Plaintiffs;

d)  Sending competing invoices to Plaintiffs' clients, causing uncertainty over contractual obligations and payment responsibilities;

e)  Negotiating to acquire Carlson's interest while concealing the existence of fabricated assignments later used to assert ownership over Plaintiffs' assets; and

f)  Introducing Amperage under false pretenses undermining Plaintiffs' viability to justify removing Plaintiffs from future deals.

282.  In doing so, HVS failed to protect the financial interests of Plaintiffs and acted to the detriment of Plaintiffs.

283.  As a direct and legal consequence of HVS's breach of its fiduciary duties, Plaintiffs have and will suffer damages, including but not limited to contractual rights, revenue streams and profits, and business opportunities, and incurred costs to address market confusion and protect their interests.

284.  Plaintiffs have a strong likelihood of success on the merits based on HVS's breaches of its fiduciary duty to Plaintiffs, as detailed above.

285.  Plaintiffs have no adequate remedy at law because monetary damages cannot restore lost client trust, prevent further misappropriation of LSAs, or ensure continued performance under long-term SLaaS projects.

286.   The balance of harms strongly favors Plaintiffs because the requested injunction merely maintains the status quo, whereas denial of injunctive relief would cause Plaintiffs irreparable harm to their business operations and contractual rights.

287.   Granting the requested injunction serves the public interest by ensuring the continued deployment and maintenance of solar streetlight infrastructure, which promotes public safety, sustainability, and reliable municipal services.

WHEREFORE, Plaintiffs demand judgment against Abramson and Brott:

Awarding Plaintiffs damages to be proven at trial:

(a)    Awarding Plaintiffs damages to be proven at trial;

(b)    Awarding Plaintiffs punitive damages;

(c)    Awarding Plaintiffs pre-judgment and post-judgment interest;

(d)    Issuing a preliminary and permanent injunction compelling HVS to honor all funding obligations under the SLaaS program, including immediate payment of overdue funding equalization amounts and return and relinquish any misappropriated LSAs or related assignment documents to Plaintiffs;

(e)    Issuing a preliminary and permanent injunction prohibiting HVS from fabricating or asserting ownership over LSA, withholding funding obligations under the SLaaS program, and interfering with Plaintiffs' client relationships; and

(f)    Granting such other relief, including any equitable relief, as this Court deems just and proper.

73

## COUNT XVI – FLORIDA DECEPTIVE AND UNFAIR
## TRADE PRACTICES ACT ("FDUPTA")
### (against HVS)

288.   Plaintiffs reallege and reincorporate paragraphs 1 through 126 of the Complaint as if fully set forth herein.

289.   This is an action under Fla. Stat. § 501.201, *et. seq.*

290.   Plaintiffs are "consumers" as defined by Fla. Stat. § 501.203(7).

291.   HVS's actions in marketing, promoting, offering, and distributing the SLaaS program, solar streetlight projects, and the associated financing and profit-sharing structure constitute 'trade or commerce' within the meaning of Fla. Stat. § 501.203(8).

292.   HVS engaged in deceptive activities and unfair trade practices in violation of Fla. Stat. §501.204.

293.   HVS violated Fla. Stat. § 501.204 by including, but not limited to:

a) Fabricating thirteen (13) purported LSA assignment documents to falsely claim ownership of Plaintiffs' contracts and equipment;

b) Misrepresenting to Plaintiffs' clients, including CDDs and Brookfield Kolter, that HVS owned Plaintiffs' streetlights and were the proper contracting party under the LSAs;

c) Sending competing invoices to CDDs, creating confusion as to payment obligations and maintenance responsibilities;

    d) Withholding payments and profits owed to Plaintiffs under the agreed financial model and refusing to acknowledge legitimate support and maintenance expenses; and

    e) Interfering with Plaintiffs' contractual relationships and business expectancy by falsely asserting ownership and soliciting Plaintiffs' clients to replace Plaintiffs' equipment.

294.   HVS's act or practice was likely to mislead and did mislead Plaintiffs' clients and business partners, causing substantial injury to Plaintiffs and the consuming public.

295.   HVS's act or practice offended established public policy and was immoral, unethical, oppressive, and unscrupulous. Such unfair acts produced substantial injury to Plaintiffs, the injury was not outweighed by any benefit to consumers, and Plaintiffs could not have reasonably avoided the injury.

296.   As a direct and legal cause of HVS's FDUPTA violations, Plaintiffs have suffered damages and have been forced to retain and pay the undersigned attorneys a reasonable fee for their services in prosecuting this action. Accordingly, HVS is liable for such fees pursuant to Fla. Stat. § 501.2105.

297.   Plaintiffs have a strong likelihood of success on the merits based on HVS's deceptive activities and unfair trade practices, as detailed above.

298.   Plaintiffs have no adequate remedy at law because monetary damages cannot restore lost client trust, prevent further misappropriation of LSAs, or ensure continued performance under long-term SLaaS projects.

299.   The balance of harms strongly favors Plaintiffs because the requested injunction merely maintains the status quo, whereas denial of injunctive relief would cause Plaintiffs irreparable harm to their business operations and contractual rights.

300.   Granting the requested injunction serves the public interest by ensuring the continued deployment and maintenance of solar streetlight infrastructure, which promotes public safety, sustainability, and reliable municipal services.

WHEREFORE, Plaintiffs demand judgment against Abramson and Brott:

Awarding Plaintiffs damages to be proven at trial:

(a)    Awarding Plaintiffs damages to be proven at trial;

(b)     Awarding Plaintiffs reasonable attorney's fees and costs pursuant to Fla. Stat. § 50.2105;

(c)    Disgorgement of all monies, profits, benefits, and other unjust gains wrongfully obtained by HVS as a result of the conduct alleged herein;

(d)    Awarding Plaintiffs pre-judgment and post-judgment interest;

(e)    Issuing a preliminary and permanent injunction compelling HVS to honor all funding obligations under the SLaaS program, including immediate

payment of overdue funding equalization amounts and return and relinquish any misappropriated LSAs or related assignment documents to Plaintiffs;

(f)    Issuing a preliminary and permanent injunction prohibiting HVS from fabricating or asserting ownership over LSA, withholding funding obligations under the SLaaS program, and interfering with Plaintiffs' client relationships; and

(g)    Granting such other relief, including any equitable relief, as this Court deems just and proper.

## COUNT XVII – EQUITABLE ACCOUNTING
### (against HVS)

301.    Plaintiffs reallege and reincorporate paragraphs 1 through 126 of the Complaint as if fully set forth herein.

302.    Plaintiffs and HVS entered into a long-term business relationship beginning in 2019 to jointly develop and fund solar streetlight projects under the SLaaS program.

303.    HVS assumed a position of trust and confidence by, including but not limited to:

a) Controlling funding flows for Plaintiffs' operations;

b) Having full access to Plaintiffs' bank accounts and financial records;

c) Participating in billing and collections on Plaintiffs; and

d) Acting as Plaintiffs' administrative partner and point of contact with third parties.

77

304. By virtue of this special relationship, HVS owed Plaintiffs fiduciary duties of loyalty, good faith, candor, and fair dealing, including the duty to:

a) Act in Plaintiffs' best interests.

b) Avoid self-dealing and conflicts of interest.

c) Disclose material facts affecting Plaintiffs' rights and obligations.

d) Refrain from conduct intended to harm Plaintiffs' business.

305. HVS assumed control over substantial financial aspects of the SLaaS program, including but not limited to:

a) Disbursement of funds for manufacturing and installation.

b) Direct payment of certain expenses on Plaintiffs' behalf.

c) Billing and collection of monthly SLaaS payments from CDDs.

d) Access to Plaintiffs' bank accounts and weekly financial reports.

306. The parties maintained a shared "Program Summary Spreadsheet" and other financial models documenting funding flows, costs, and profit allocations for a 20-year term.

307. Plaintiffs and HVS agreed to share profits from SLaaS projects and maintain transparency in all financial dealings.

308. Despite this agreement, HVS:

a) Withheld equalization payments owed to Plaintiffs;

b) Refused to acknowledge legitimate support and maintenance expenses;

c) Relied on undisclosed internal accounting to justify withholding funds; and

d) Failed to provide supporting documentation for its calculations despite repeated requests.

309. The financial transactions between Plaintiffs and HVS are complex and extensive, involving millions of dollars transferred over multiple years, numerous projects, and shared revenue streams.

310. Plaintiffs have no adequate remedy at law because the precise amount owed cannot be determined without a full and complete accounting of all funds received, disbursed, and retained by HVS.

311. HVS's refusal to provide an accounting has deprived Plaintiffs of their rightful share of profits and reimbursement for expenses.

312. Plaintiffs have suffered significant financial harm, including but not limited to (a) loss of operating capital and profits; (b) inability to maintain the SLaaS program due to withheld funds; and (c) suspension of multimillion-dollar projects caused by HVS's actions.

WHEREFORE, Plaintiffs seek:

(a)    An order requiring HVS to provide a full and complete accounting of all funds received from CDDs and other clients under the SLaaS program, all funds disbursed for support and maintenance of the SLaaS program, all funds disbursed to

Plaintiffs or paid on Plaintiffs' behalf, and all profits retained by HVS and its investors;

(b)    Payment of all amounts determined to be owed to Plaintiffs following such accounting; and

(c) Any further relief, including equitable relief, this Court deems just and proper.

<h2 style="text-align:center"><u>JURY TRIAL DEMAND</u></h2>

Plaintiffs demand a jury trial on issues so triable.


Dated: December 5, 2025                Respectfully submitted,

*/s/ Jordan L. Behlman*
**JORDAN L. BEHLMAN, ESQ.**
Florida Bar No.: 111359
Primary: jbehlman@lawcantrell.com
**MATTHEW A. CERIALE, ESQ.**
Florida Bar No.: 1020226
Primary: mceriale@lawcantrell.com
Secondary: paralegal3@lawcantrell.com
CANTRELL SCHUETTE PA
401 East Jackson Street, Suite 2340
Tampa, Florida 33602
Telephone: (877) 858-6868
*Counsel for Plaintiffs*

## VERIFICATION

I, Joel Brayman, being over the age of 18 and competent to testify, as corporate representative for Recovered Energy Technologies, Inc. and Recovered Energy Technologies USA, Inc., hereby declare that I am an authorized representatives of Plaintiffs in the above-styled action. I have read the foregoing Verified Complaint and know the contents thereof.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the facts stated in the Verified Complaint are true and correct to the best of my knowledge and belief.

Executed on this ___ day of December, 2025, in Kemptville, Ontario, Canada.

_____

Joel Brayman, as corporate representative for Recovered Energy Technologies, Inc. and Recovered Energy Technologies USA, Inc.